IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JESSICA ANN FARLEY,

       **Plaintiff,**

v.                                     **Case No.: 3:19-cv-00276**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 9, 10).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On April 8, 2015, Plaintiff Jessica Ann Farley ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of August 5, 2010 due to chronic obstructive pulmonary disease ("COPD"), back problems, "blood pressure," carpal tunnel syndrome, acid reflux, fibromyalgia, anxiety, and depression. (Tr. at 276-86, 313). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 11). Claimant then filed a request for an administrative hearing, which was held on January 23, 2018 before the Honorable Jerry Meade, Administrative Law Judge. (Tr. at 56-86). At the hearing, Claimant moved to amend her disability onset date to May 25, 2013. (Tr. at 295). By written decision dated March 20, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 8-28). The ALJ's decision became the final decision of the Commissioner on February 22, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Brief in Support of Motion for Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 9, 10). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 43 years old on her amended alleged onset date and 48 years old on the date of the ALJ's decision. Claimant completed the eleventh grade and previously

worked as a forklift operator and line driver in a factory. (Tr. at 83, 314-15).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent

the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the

impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 25, 2013, the amended alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: obesity, osteoarthritis, degenerative disc disease of the cervical spine, mild degenerative disc disease of the lumbar spine, hiatal hernia, myofascial pain syndrome, COPD, mild right carpal tunnel syndrome, major depressive disorder, and panic disorder without agoraphobia. (Tr. at 19-20, Finding No.

5

3). The ALJ considered Claimant's hypertension, reflux, irritable bowel syndrome, adenoma of the colon, hemorrhoids, history of cardiac ablation, gastritis, diabetes mellitus, syncope, bursitis/impingement of the left shoulder, and hypertensive cardiovascular disease, but found the impairments to be non-severe. (Tr. at 14). The ALJ further found that Claimant's alleged urinary incontinence, tremors, and fibromyalgia were not medically determinable impairments. (*Id.*).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-17, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can occasionally climb, stoop, kneel, crouch, and crawl. She can frequently balance. She must avoid concentrated exposure to extreme cold; extreme heat; vibrations; irritants such as fumes, odors, dusts, gases, and poorly ventilated areas; and hazards such as moving machinery and unprotected heights. She can frequently handle, finger, and feel with the right upper extremity. The claimant can understand, remember, and carry out simple instructions. She can have occasional changes in the work setting. She can have occasional interaction with the public. She can have frequent interaction with co-workers and supervisors.

(Tr. at 17-21, Finding No. 5). At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 21, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine Claimant's ability to engage in other substantial gainful activity. (Tr. at 21-22, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1969 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules

6

supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 21, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including light-level work as a bolt assembler, price marker, or routing clerk or sedentary-level work as a final assembler, sorter, or table worker. (Tr. at 21-22, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 22, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant contends that the Commissioner's decision is not supported by substantial evidence because the ALJ "failed to properly consider the medical evidence of record regarding [her] mental and physical impairments and incorporate the same into the credibility determination and [RFC] analysis." (ECF No. 9 at 5). In support, Claimant lists certain medical records relating to her degenerative disc disease, myofascial pain syndrome, COPD, right carpal tunnel syndrome, depression, and panic disorder, and "[n]umerous statements indicating [that she was] disabled, temporarily disabled, or unable to work." (*Id.* at 5-6). Claimant argues that "[i]t is more reasonable to conclude" that her physical impairments precluded "any substantial gainful activity and certainly not work at the light exertional level." (*Id.* at 7).

Further, she contends that the ALJ should have accepted the VE's opinion that she could not work if she was absent from work three to four days per week. (*Id.* at 6). In response to Claimant's challenges, the Commissioner argues that substantial evidence supports the ALJ's credibility and RFC findings. (ECF No. 10 at 9-14).

## V.     <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

On October 29, 2013, Claimant followed up with her primary care physician, Renato P. Ramirez, M.D., stating that she was feeling better after treatment for bronchitis. (Tr. at 422). Claimant was a "heavy smoker," and had decreased breath sounds and rhonchi on examination. (Tr. at 422, 424). Nevertheless, Claimant's anteroposterior chest x-ray taken on November 17, 2013 showed clear lung fields. (Tr. at 465).

On November 7, 2013, Claimant presented as a new patient to chiropractor, Steven D. Novicky, D.C., after she reportedly tripped and fell on her right side while carrying wood at work on April 9, 2013.[1] (Tr. at 413). Claimant complained of pain in her neck, right upper extremity and shoulder, low back, and bilateral lower extremities, particularly her left lower extremity. (*Id.*). Dr. Novicky diagnosed Claimant with unresolved cervical and lumbar sprains/strains. He recommended physical therapy at a frequency of two-to-three times per week for a period of six weeks. (Tr. at 414). Dr. Novicky stated that due to Claimant's "current clinical status," he felt that she was incapable of any sustained remunerative activity; accordingly, he placed her on temporary total disability. (*Id.*). On November 15, 2013, Dr. Novicky extended Claimant's temporarily disability status from November 7, 2013 through December 15, 2013, but stated that she might be able to return to work on December 16, 2013. (Tr. at 400). Claimant participated in physical therapy from November 2013 through January 2014. (Tr. at 402-12).

---

[1] Other records reference that the injury occurred on March 9, 2013. (Tr. at 397, 417).

On December 2, 2013, MRI scans were taken of Claimant's lumbar and cervical spine. In her lumbar spine, Claimant had a mild annular disc bulge at L4-5 without herniation. (Tr. at 418). All foramina were widely patent without nerve root exit compromise, and there was no evidence of subcortical stress, osteoedema, or spinal masses. (*Id*.). In her cervical spine, Claimant had a central annular disc bulge at C5-6, also without herniation, no extruded disc, and no evidence of nerve root compromise. (Tr. at 420). Her foramina were similarly widely patent, and her nerve root exits were without any entrapment. (*Id*.).

On December 10, 2013, Claimant told Dr. Ramirez that her right forearm ached when she attempted to lift or carry anything. (Tr. at 428). She exhibited tender points all over her back and extremities, but had no deformity of her spine; full range of motion in all joints; no focal deficits; and normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. at 426). In addition, her lungs were clear to auscultation; she was alert and cooperative with normal mood, affect, attention span, and concentration; and she was not in any acute distress.

Claimant presented to Cynthia D. Novotny, PA-C, for a gynecological examination shortly thereafter on December 19, 2013. (Tr. at 498). P.A. Novotny noted that Claimant was obese with a "dusky color to [her] skin," but her blood pressure and respiration rate were normal. (Tr. at 500). Claimant followed up with Dr. Novicky on January 6, 2014 for continued complaints of neck and low back pain. (Tr. at 394). Claimant's straight leg raising test was positive bilaterally at 72 degrees;[2] she had limited range of motion in her

---

[2] "The Straight Leg Raise (SLR) test is a neurodynamic test that checks the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression. These tests, along with relevant history and decreased range of motion, are considered by some to be the most important physical signs of disc herniation, regardless of the degree of disc injury." https://www.physio-pedia.com/Straight_Leg_Raise_Test.

cervical and lumbar spine with moderate pain on testing; and her grip strength was diminished. (Tr. at 394-95). Claimant had good muscle strength except Dr. Novicky noted fair strength in Claimant's cervical flexion and extension and in her lumbar extensor muscles. (Tr. at 396). Her diagnoses remained cervical and lumbar sprain/strain. (*Id.*). Dr. Novicky noted that Claimant's temporary disability was continued until February 9, 2014, and she might be able to return to work at that time. (*Id.*).

On March 11, 2014, Claimant reported to Dr. Ramirez that her fingers were "hurting" from fibromyalgia, and it was hard to open soda pop cans. (Tr. at 493). She also complained of a sore throat that was improving and dizziness when she stood up. On examination, Claimant had decreased breath sounds and rhonchi, but, again, no deformity of her spine or extremities; full range of motion in all joints; no focal deficits; normal sensation, reflexes, coordination, muscle strength, and tone; alert and cooperative behavior with normal mood, affect, attention span, and concentration, and no acute distress. (Tr. at 496). An x-ray of Claimant's chest was taken on March 26, 2014 to evaluate her reported rib pain. The visible portion of her left lung was noted to be clear. (Tr. at 463).

Claimant followed up with Dr. Ramirez on April 25, 2014. She complained of being dizzy for the prior three weeks, experiencing numbness all over, having some "black out spells," and feeling like she was having panic attacks. (Tr. at 488). Claimant stated that her blood pressure was "ok" when she measured it at home. (*Id.*). During the appointment, Claimant's blood pressure and respiration rate were normal; her lungs were clear to auscultation; and she had full range of motion in all joints, no focal deficits, and normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. at 488, 490-91). However, Claimant appeared depressed, anxious, easily distracted, hyperactive, and

agitated during the visit. (Tr. at 491). Dr. Ramirez referred Claimant to a rheumatologist and advised her to go to Stairways Behavioral Health for psychiatric evaluation and management. (Tr. at 491-92).

On June 12, 2014, Claimant's hands and wrists were x-rayed. Her left hand was normal, and her right hand was unremarkable other than mild congenital shortening of the fourth metacarpal bone. (Tr. at 459-62). Claimant presented to P.A. Novotny days later for her three-month follow-up appointment on June 17, 2014. (Tr. at 483). P.A. Novotny recorded that Claimant voiced "no concerns." (*Id*.). However, in her review of systems, Claimant reported joint pain and muscle weakness, especially in her hands, but Claimant confirmed that her breathing had "been good" despite the fact that she continued to smoke. (Tr. at 483-84.). On examination, Claimant had rhonchi and was anxious, but she did not have any focal deficits. She had normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. at 485). She was in no acute distress and was alert and cooperative with normal mood, affect, attention span, and concentration. (*Id*.). Claimant's diagnoses included arthritis, tobacco abuse, COPD, and hypertension. (Tr. at 485-86).

On July 3, 2014, Claimant presented to Frank Yohe, M.D., for a psychiatric evaluation at Stairways Behavioral Health. (Tr. at 514). Claimant stated that she had problems with panic attacks "off and on" for the past five-to-ten years, and they "seemed to go away" but returned in the past year. (*Id*.). She also reported mild depression and "some sleep difficulty." (*Id*.). Claimant related that she had never seen a psychiatrist or received mental health treatment. (*Id*.). On examination, Claimant's mood was mildly depressed, but she was alert, oriented, and cooperative with good eye contact, spontaneous and goal-directed speech, full and appropriate thought content, and intact

recent and remote memory. (Tr. at 515). Dr. Yohe diagnosed Claimant with panic disorder without agoraphobia and depressive disorder. (*Id.*). He continued her prescription for Remeron as a sleep aid, and increased her dosage of Paxil, noting that it seemed to help a little bit with her panic attacks. (*Id.*). Dr. Yohe additionally prescribed Vistaril for Claimant to take for anxiety, as needed. (*Id.*).

Claimant followed up with Cassandra Byers, P.A., at Stairways Behavioral Health on August 12, 2014. (Tr. at 517). Claimant reported that she still suffered from panic attacks and depression. (*Id.*). However, her mental status examination was fully within normal limits with the exception of her depressed and somewhat anxious mood, including normal speech, thought process, associations, judgment, insight, orientation, recent and remote memory, attention, concentration, fund of knowledge, and language. (Tr. at 518). P.A. Byers discontinued Claimant's prescription for Prozac and prescribed Effexor in its place, increased Claimant's dosage of Vistaril, renewed Claimant's prescription for Remeron, and continued Claimant's referral for individual therapy. (Tr. at 519).

During Claimant's subsequent monthly appointments with P.A. Byers on September 23, and October 14, 2014, Claimant's mental status examination was normal other than her depressed mood. (Tr. at 521, 524). P.A. Byers increased Claimant's dosage of Effexor, renewed her prescriptions for Remeron and Vistaril, and instructed her to continue therapy. (Tr. at 525). On December 2, 2014, Claimant's mood was "fine" with a mildly restricted affect during her visit with P.A. Byers, but her mental status examination did not reveal any other abnormalities, and her mood and affect "brightened" during the appointment. (Tr. at 530).

On September 19, 2014, Claimant presented to P.A. Novotny for a checkup. (Tr. at 470). She related ongoing issues with her back and fibromyalgia, claiming that her mid-

back was bothering her lately. (Tr. at 472). Claimant still smoked cigarettes every day. (*Id.*). On examination, Claimant had rhonchi, joint tenderness, decreased range of motion, and muscle soreness along her spine, but no focal deficits and normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. at 473). P.A. Novotny recorded that Claimant was alert and cooperative with normal mood, affect, attention span, and concentration, and that she was in no acute distress, but anxious. (*Id.*). P.A. Novotny ordered x-rays and referred Claimant to pain management for back pain. (Tr. at 473-74).

On June 29, 2016, Claimant saw Clifford Roberson, M.D., at Roberson Orthopedic Clinic, for worsening numbness and weakness in her hands, which she reportedly suffered for the past three-to-four years, and chronic low back pain that was radiating into her lower extremities. (Tr. at 807). On examination, Claimant's lungs were clear with no rales, rhonchi, or wheezing. (Tr. at 808). She also did not have any neurological or psychiatric issues. (*Id.*). Claimant exhibited slight weakness in pinch and grip bilaterally and decreased sensation to pinprick along her median nerve distribution, but there was no evidence of thenar or hypothenar atrophy in her hands, she had full range of motion of the metacarpophalangeal and interphalangeal joints, she could make complete fists, and her Tinel's[3] and Phalen's[4] tests were negative. (*Id.*). In her lumbar spine, Claimant expressed tenderness to palpation and pain during range of motion testing, but her spine did not have any deformity and her reflexes were intact, her straight leg raising tests were

---

[3] "Tinel's sign: The sign that a nerve is irritated. Tinel's sign is positive when lightly banging (percussing) over the nerve elicits a sensation of tingling, or 'pins and needles,' in the distribution of the nerve. For example, in carpal tunnel syndrome, where the median nerve is compressed at the wrist, the test for Tinel's sign is often positive, eliciting tingling in the thumb, index, and middle fingers." https://www.medicinenet.com/script/main/art.asp?articlekey=16687.

[4] The Phalen's test is used to diagnose carpal tunnel syndrome. https://www.physio-pedia.com/Phalen %E2%80%99s_Test.

negative, and she did not have any sensory deficits. (*Id*.). Dr. Roberson diagnosed Claimant with bilateral carpal tunnel syndrome and low back pain. (*Id*.). He ordered EMG and nerve conduction studies of her upper extremities and an x-ray and MRI of her lumbar spine. (*Id*.).

There was no change in Claimant's condition during her follow-up appointment with Dr. Roberson on August 2, 2016 except that her Tinel's sign was positive on the right. (Tr. at 812). Dr. Roberson explained to Claimant that her EMG and nerve conduction study results were consistent with mild carpal tunnel syndrome on the right and negative for carpal tunnel syndrome on the left. (*Id*.). He injected her right wrist with Celestone and applied a splint. (*Id*.).

On January 31, 2017, Claimant presented for a pain management consultation with Joseph DeLapa, II, M.D., regarding pain in her low back and legs. (Tr. at 770). Claimant stated that she experienced the pain for "many years" and that it was not caused by an accident or injury. (Tr. at 771.). Her daily activities included sitting and watching television, and she confirmed that she did not have any restriction in her activities of daily living. (*Id*.). Claimant continued to smoke every day. (Tr. at 772).

Dr. DeLapa recorded that Claimant's CT study of her lumbar spine showed no fracture of subluxation and only mild degenerative disc space narrowing at L5-S1. (Tr. at 773). On examination, she was in no acute distress; had stable behavioral patterns, relevant and coherent speech with average rate of fluency, unlabored respirations, and grossly intact neurological function; and she stood and walked unassisted. (Tr. at 774). Her lumbar range of motion was limited and she expressed pain, but her lower extremities were normal in appearance with unrestricted, non-painful movement, no muscle wasting or weakness, full muscle strength on a global basis, no sensory deficits, normal reflexes,

and negative Faber[5] and straight leg sitting tests. (*Id*.). Dr. DeLapa diagnosed Claimant with lumbar degenerative disc disease, myofascial pain syndrome, and spondylosis of the lumbar region without myelopathy or radiculopathy. (*Id*.). He recommended three sessions of trigger point injections; a physical therapy evaluation and treatment, if indicated; low back strengthening and stretching exercises; and smoking cessation. (Tr. at 774-75).

On March 1, 2017, Claimant presented to Randall Hawkins, M.D., to establish care with a family physician. (Tr. at 603). On examination, her respiration rate was normal with no labored breathing, wheezing, retractions, rales, crackles, rhonchi, or stridor. (Tr. at 605-06). Her musculoskeletal findings, gait, reflexes, motor strength, mental status, affect, and judgment were also normal. (Tr. at 606-07). Claimant's chronic conditions, which included diabetes, hypertension, depression, anxiety, and hyperlipidemia, were all stable. (Tr. at 608). Dr. Hawkins stated that Claimant's abdominal pain was likely gastritis, and he instructed her to stop smoking. (*Id*.). The following month, Claimant saw Matthew J. Hofeldt, M.D., on April 26, 2017. (Tr. at 731). Claimant's chest was still clear bilaterally and her motor function was intact in all extremities. (Tr. at 732-33).

Claimant presented to Breanna Whitmore, FNP-BC, on May 25, 2017, regarding mid back pain. (Tr. at 789). Claimant noted that she had surgery on May 8 to remove colon cancer, and she did not need to undergo chemotherapy. (*Id*.). Her examination results and diagnoses were the same as Dr. DeLapa noted in January 2017, but Nurse Whitmore additionally noted Claimant's non-antalgic gait. (Tr. at 790). Claimant's MRI showed some degenerative changes and facet arthropathy. (Tr. at 791). Nurse Whitmore

---

[5] The FABER (Patrick's) Test stands for: Flexion, Abduction and External Rotation. These three movements combined result in a clinical pain provocation test to assist in diagnosis of pathologies at the hip, lumbar and sacroiliac region. https://www.physio-pedia.com/FABER_Test.

scheduled Claimant for right facet nerve block at L3-L5, and stated that if Claimant received relief, it would be followed with radiofrequency. (*Id.*).

On December 4, 2017, Claimant saw psychiatrist, Sheeba Rahman, M.D., at Prestera Center. (Tr. at 610). Claimant stated that her mood was improving, but she was anxious about her upcoming disability hearing. (*Id.*). Her mood was euthymic, and she displayed calm motor activity, fair attention/concentration, normal speech and orientation, and intact memory, thought processes, and judgment. (Tr. at 611). Claimant's ambulation remained steady and unassisted. (Tr. at 612). Two days later, on December 6, 2017, Claimant underwent a lumbar facet rhizotomy of the medial branches of her primary dorsal rami. (Tr. at 801). She was alert and oriented and her heart and lungs were within normal limits. (Tr. at 802). Claimant stated that she had no restrictions in activities of daily living. (*Id.*).

### B. Evaluations and Opinions

On August 13, 2013, Dr. Ramirez completed a form for the Pennsylvania Department of Public Welfare, stating that Claimant was temporarily disabled from August 13, 2013 until August 12, 2014. (Tr. at 725). He listed her diagnoses as fibromyalgia, COPD, hypertension, and arrythmia with a secondary diagnosis of depression. (*Id.*). The form stated that it would be used to evaluate whether Claimant was eligible for general assistance (GA) benefits or would be exempted from the work requirements for temporary assistance for needy families (TANF) benefits. (*Id.*).

On June 30, 2015, Robert Holley, M.D., performed an Internal Medicine Examination ("IME") of Claimant at the request of the West Virginia Disability Determination Service. Dr. Holley noted Claimant's past left elbow surgery in April 1991. (Tr. at 557). He recorded that she was obese, but neatly dressed and in no acute distress.

(Tr. at 558). Claimant's pulse and respiration rate were normal. Her lungs were clear to percussion and auscultation, and she did not have any wheezing, rales, rhonchi, or other breathing issues. (Tr. at 559). Claimant was tender to palpation along her spine and left shoulder, and her gait was antalgic, but she did not have any red, hot, swollen, clicking, or locking joints. (*Id.*). She had 4/5 motor strength in her upper and lower extremities, 4/5 grip strength, normal reflexes and sensation, and no other neurological issues. (*Id.*). Her cognition, recall, remote memory, mood, and affect were also normal. (*Id.*). Claimant had tendon xanthomas over the metacarpophalangeal joints in her hands. (*Id.*). However, she could fully extend her hands, make complete fists, and oppose her fingers. (*Id.*). Her fine manipulation was intact. (*Id.*). Claimant expressed pain and limited range of motion on testing, but her effort was only fair. (Tr. at 559-60). Her straight leg raising test was negative, and she did not use an assistive device for ambulation. (Tr. at 560). Dr. Holley diagnosed Claimant with, *inter alia*, lumbosacral radiculopathy, COPD, obesity, depression/anxiety, and bursitis/impingement of her left shoulder. (Tr. at 560).

On July 28, 2015, Curtis Withrow, M.D, assessed Claimant's physical RFC based upon the medical evidence. Dr. Withrow concluded that Claimant could perform work at the light exertional level with frequent balancing and otherwise occasional postural activities. (Tr. at 123). Dr. Withrow did not assess any manipulative limitations, but stated that Claimant should avoid concentrated exposure to temperature extremes, vibration, fumes, and hazards. (Tr. at 123-24). Rogelio Lim, M.D., affirmed Dr. Withrow's RFC assessment on October 27, 2015. (Tr. at 155-57).

On July 31, 2015, Debra Lilly, Ph.D., performed a psychiatric review technique based upon her review of Claimant's records. Dr. Lilly concluded that Claimant had mild limitation in activities of daily living and moderate limitations in social functioning and

maintaining concentration, persistence, or pace. (Tr. at 121). In terms of Claimant's mental RFC, Dr. Lilly found that Claimant was moderately limited in understanding, remembering, and carrying out detailed instructions and maintaining concentration for extended periods, but she did not have other significant mental limitations. (Tr. at 124-26). Holly Cloonan, Ph.D., affirmed this assessment on November 3, 2015. (Tr. at 153-54, 157-59).

On June 7, 2016, Dr. Holley wrote on a prescription pad that Claimant was under his care and unable to work until June 7, 2017. (Tr. at 570). The following year, on May 31, 2017, Dr. Hawkins signed a disability verification form for the Housing Authority of the City of Point Pleasant. (Tr. at 726).

### C. Claimant's Statements

Claimant testified during her administrative hearing on January 23, 2018 that she lived alone in an apartment that her church fully subsidized. (Tr. at 62). She previously lived with either one of her daughters and her "preacher and his wife who took [her] in" because she was "having a lot of issues, medical issues." (Tr. at 62-63). Claimant stated that she had a license and would be able to drive, if she had a car. (Tr. at 64-65). She smoked since the age of 16 and currently smoked 6 or 7 cigarettes per day, which was reduced from her former rate of one pack of cigarettes per day, because she was "trying to quit." (Tr. at 66). Claimant testified that she experienced back pain most of the time, but it varied, and it was aggravated by doing a lot of "sweeping" or leaning over the sink to brush her teeth or do dishes. (Tr. at 69). Claimant stated that injections worked "real good" initially, but they stopped providing relief, and the nerve block "didn't work very good." (Tr. at 69-70). Claimant described her back pain as throbbing and she complained that her legs cramped if she sat for too long. (*Id.*). Claimant testified that her hands

cramped and became numb from fibromyalgia. (*Id*.). She claimed that she was supposed to have surgery on her hands, but it was "on hold" due to gall bladder and stomach issues. (Tr. at 71). Claimant further testified that her feet and ankles swelled when she stood or walked, and she stated that she fell once every month or two months. (*Id*.). In terms of COPD, Claimant indicated that she felt like she did not "have any air anymore it seem[ed]." (*Id*.). She also endorsed "real bad anxiety" and panic attacks. (Tr. at 73). She conceded that she did not have panic attacks "so much anymore," but alleged that she was anxious for 30 minutes to one hour once every "couple of weeks". (Tr. at 74). Claimant testified that she could not "remember nothing." (Tr. at 75). She acknowledged that she did not require reminders, but stated that she often forgot what she was doing. (*Id*.). In terms of daily activities, Claimant did "stuff" around the house on good days, but on bad days, which she claimed occurred two or three days per week, she usually just sat or lay in a recliner and watched television or worked on puzzle books. (Tr. at 76-77). Claimant alleged that she could hardly stand after she walked a couple of blocks to an appointment. (Tr. at 77). However, she affirmed that she could lift a gallon of milk, take out a small bag of trash, and care for her personal hygiene. (Tr. at 78). She routinely made coffee, worked on puzzle books, washed dishes, and prepared simple meals. (Tr. at 79-80). She also attended church services three times per week, which lasted 60 to 90 minutes. (Tr. at 80).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

[E]vidence which a reasoning mind would accept as sufficient to support a

> particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    **Discussion**

As  noted above, Claimant argues that the ALJ did not properly consider the evidence of degenerative disc disease, myofascial pain syndrome, COPD, right carpal tunnel syndrome, depression, panic disorder, and Claimant's physicians' statements that she could not work, when assessing her credibility and RFC. Further, she contends that the ALJ should have accepted the VE's opinion that she could not work if she was absent from work three-to-four days per week. Her arguments are considered below, in turn.

### A. Credibility

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider

"all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical

evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant,

the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ clearly performed the two-step process. The ALJ noted Claimant's allegations of chronic neck and back pain, shortness of breath with exertion, joint pain, pain and numbness in her right upper extremity, difficulty with memory and concentration, depression, and anxiety. (Tr. at 17-18). Ultimately, after considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 19). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id*.). First, the ALJ noted that Claimant alleged that COPD limited her ability to work, yet she continued to smoke against medical advice. (*Id*.). Second, the ALJ recounted that Claimant alleged urinary incontinence and tremors, but there was no objective evidence in the record to substantiate such allegations. (*Id*.). Third, the ALJ discussed that, at various points in the record, Claimant reportedly performed many activities, which indicated a greater ability to function than she alleged at the hearing. Moreover, pain management records contained entries indicating that Claimant reported having no restrictions in activities of daily living. (*Id*.). Fourth, the ALJ noted that Claimant alleged disability due to diabetes, hypertension, depression, and anxiety, yet treatment notes dated March 1, 2017 indicated that all of those conditions were stable. (*Id*.).

Claimant does not offer any argument to dispute the ALJ's above analysis or conclusions; rather, Claimant cites to her December 2013 MRIs of her lumbar and cervical spine showing disc bulges at C5-6 and L4-5, respectively; certain physical examinations

indicating decreased breath sounds and rhonchi; an x-ray of her right wrist showing congenital shortening of the fourth metacarpal bone; her June 2015 independent medicine examination results; her January 2017 CT scan showing degenerative disc space narrowing at L5-S1 and diagnosing her with myofascial pain syndrome; mental status examinations indicating panic disorder and depressive disorder; and statements from her physician that she was unable to work. (ECF No. 9 at 5-6). Claimant states in disbelief that "[e]ven in light of the aforesaid objective evidence medical evidence of multiple physical and mental impairments," the ALJ found that her allegations were not entirely consistent with the medical evidence and other evidence of record.

However, the records that Claimant referenced do not undermine the ALJ's credibility findings in any way. For instance, during Claimant's June 2015 independent medicine examination with Dr. Holley, Claimant did not have any breathing issues and her respiration rate was normal. (Tr. at 558-59). Although she expressed tenderness to palpation, pain, limited range of motion, and an antalgic gait, her effort was only fair during testing. (Tr. at 559-60). Notwithstanding her limited effort, she did not require an assistive device; her straight leg raising test was negative; there were no issues with her joints; and she had 4/5 motor strength and normal reflexes, sensation, cognition, recall, remote memory, mood, and affect. (*Id*.). Claimant had tendon xanthomas over the MP joints in her hands, but she could fully extend her hands, make complete fists, oppose her fingers, and her fine manipulation was preserved. (Tr. at 559).

Thereafter, in June and August 2016, Claimant saw Dr. Roberson for pain and numbness in her hands and chronic low back pain that Claimant stated radiated into her extremities. (Tr. at 807). On examination, Claimant's lungs were again clear, and she did not have any neurological or psychiatric issues. (Tr. at 808). Claimant had slight weakness

in pinch and grip bilaterally and decreased sensation to pinprick along her median nerve distribution, but there was no evidence of thenar or hypothenar atrophy in her hands. She maintained full range of motion of her metacarpophalangeal and interphalangeal joints, could still make complete fists, and her Tinel's and Phalen's tests were negative. (*Id*.). In her lumbar spine, Claimant expressed tenderness to palpation and pain during range of motion testing, but her spine did not have any deformity and her reflexes were intact; her straight leg raising tests were negative; and she did not have any sensation deficits. (*Id*.). There was no change in Claimant's condition in August 2016, except that she had a positive Tinel's sign on the right. (Tr. at 812). However, her EMG and nerve conduction study showed only mild carpal tunnel syndrome on the right and was negative for carpal tunnel syndrome on the left. (*Id*.).

In January 2017, Claimant saw Dr. DeLapa for a pain management consultation regarding pain in her low back and legs. (Tr. at 770). Claimant confirmed that she did not have any restriction in her activities of daily living and that she continued to smoke every day. (Tr. at 771-72). A CT study of her lumbar spine showed no fractures or subluxation and only mild degenerative disc space narrowing at L5-S1. (Tr. at 773). On examination, she was in no acute distress and had stable behavioral patterns, relevant and coherent speech with average rate of fluency, unlabored respirations, and grossly intact neurological function. (Tr. at 774). Claimant stood and walked unassisted. Her lumbar range of motion was limited and she expressed pain, but her lower extremities were normal in appearance with unrestricted, non-painful movement, no muscle wasting or weakness, full muscle strength on a global basis, no sensory deficits, normal reflexes, and negative Faber and straight leg sitting tests. (*Id*.). Dr. DeLapa advised Claimant to stop smoking. (Tr. at 775).

Claimant then saw Dr. Hawkins in March 2017. (Tr. at 603). Her respiratory examination was again normal with no labored breathing, wheezing, retractions, rales, crackles, rhonchi, or stridor. (Tr. at 605-06). Her musculoskeletal findings, gait, reflexes, motor strength, mental status, affect, and judgment were also normal. (Tr. at 606-07). Her chronic conditions, which included diabetes, hypertension, depression, anxiety, and hyperlipidemia were all stable. (Tr. at 608). Claimant was again told to stop smoking. (*Id*.). The following month, yet another provider, Dr. Hofeldt, noted that Claimant's chest was clear bilaterally and her motor function was intact in all extremities. (Tr. at 732-33).

Therefore, the medical records cited by Claimant very clearly support, rather than contradict, the ALJ's credibility analysis. Furthermore, the ALJ properly considered Claimant's statements, her daily activities, and the rest of the evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. The ALJ noted that Claimant prepared simple meals, performed light housework, took care of her personal needs without requiring reminders, shopped for groceries, worked on word search puzzles for hours each day, watched television, socialized with her family, and attended church regularly. (Tr. at 15-16). Claimant offers nothing to rebut the ALJ's well-reasoned conclusions and specific citations to the medical evidence, opinion evidence, and Claimant's testimony. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### B. Weight of Opinions

Claimant argues that the ALJ did not give proper credence to the various statements from her medical providers that she was disabled. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R.

§§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[6] *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[7]

---

[6] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). However, Claimant's applications were filed in 2015, and the treating physician rule applied to her claims.

[7] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

"Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ expressly considered the various statements from Claimant's physicians that Claimant was temporarily or totally disabled, (Tr. at 20), including Dr. Novicky's statements that Claimant was disabled from November 7, 2013 through February 9, 2014, (Tr. at 396, 400, 414); Dr. Ramirez's, statement that Claimant was temporarily disabled from August 13, 2013 until August 12, 2014, (Tr. at 725); Dr. Holley's statement that Claimant could not work until June 7, 2017, (Tr. at 570); and Dr. Hawkins's statement on a May 31, 2017 form that Claimant was disabled, (Tr. 726). The ALJ correctly explained that the statements were not medical opinions, but were opinions on issues expressly reserved to the Commissioner, which were not entitled to special analysis or significance. (Tr. at 20).

Substantial evidence supports the ALJ decision to reject these disabling opinions

for the following reasons. Claimant presented as a new patient to chiropractor, Dr. Novicky, in November 2013, after she tripped and fell on her right side while carrying wood at work. (Tr. at 413). Dr. Novicky only diagnosed Claimant with cervical and lumbar sprains/strains and recorded in Claimant's clinical record that she had limited cervical and lumbar range of motion on testing, a positive straight leg raising test on the right side at 72 degrees, and decreased grip strength, but good muscle strength. (Tr. at 396). Dr. Novicky did not provide any explanation for his statements that Claimant was temporarily disabled, nor did his clinical records provide any clear insight into the reasons for those opinions. In addition, as discussed below, subsequent records documented full grip and muscle strength and other normal findings.

Dr. Ramirez likewise did not provide any explanation for his August 13, 2013 opinion that Claimant was temporarily disabled until August 12, 2014. He merely listed Claimant's diagnoses of fibromyalgia, COPD, hypertension, and arrythmia with a secondary diagnosis of depression. (Tr. at 725). A review of Dr. Ramirez's treatment records reveals a note in March 2014 that Claimant's fingers had been hurting from fibromyalgia, making it "hard to open pop cans;" she had a sore throat that was improving; and she felt dizzy when she stood up. (Tr. at 493). On examination, Claimant had decreased breath sounds and rhonchi, but normal blood pressure and respiration rate; no deformity of her spine or extremities; full range of motion in all joints; no focal deficits; and normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. at 493, 496). Mentally, she was alert and cooperative with normal mood, affect, attention span, and concentration, and she was in no acute distress. (Tr. at 496). In April 2014, Dr. Ramirez again recorded Claimant's normal blood pressure and respiration rate, her lungs were clear to auscultation, she did not have any spinal deformity, and she had full range

31

of motion in all joints, no focal deficits, and normal sensation, reflexes, coordination, muscle strength, and tone. (Tr. at 490-91). Thus, it is unclear from these and Dr. Ramirez's other records what informed his opinion that Claimant could not work for nearly one year.

Like the foregoing physicians, neither Dr. Holley nor Dr. Hawkins provided explanation or support for their opinions that Claimant was disabled. As noted, Dr. Holley's June 30, 2015 examination of Claimant revealed no issues with her breathing, joints, neurological function, mental status, or use of her hands. (Tr. at 559-60). She exhibited tenderness to palpation, pain, limited range of motion, and an antalgic gait, but her effort was only fair during testing. (*Id.*). She did not require an assistive device and her muscle and grip strength were only slightly reduced. Dr. Hawkins's examination of Claimant in March 2017, only a few months before he rendered his disability opinion, was even less remarkable. Claimant's breathing, gait, musculoskeletal findings, reflexes, motor strength, mental status, affect, and judgment were all normal. (Tr. at 605-07). Dr. Hawkins recorded that Claimant's chronic conditions, which included diabetes, hypertension, depression, anxiety, and hyperlipidemia were all stable. (Tr. at 608).

In sum, none of the physicians who rendered statements that Claimant was partially or totally disabled provided any support for the conclusions. Moreover, their own clinical records, and indeed the record as a whole, failed to explain or validate their opinions of disability. Therefore, given the lack of supportability and consistency with the record, the ALJ's decision to reject the physicians' opinions that Claimant could not work is amply justified. As the ALJ concluded, the determination of whether Claimant is disabled is an issue reserved to the Commissioner, and the opinions from her physicians that she was disabled were not entitled to special deference. In addition, the ALJ's

thorough analysis and explanation of the evidence provided more than adequate justification to discount the physicians' opinions. Namely, as the ALJ cited, Claimant's records as late at 2017, from no less than six different medical providers, showed that Claimant's chronic conditions were stable, she did not have any issues breathing or walking, and she had full muscle strength on a global basis, grossly intact neurological function, no restriction in activities of daily living, and normal mental status. (Tr. at 605-08, 611-12, 732-33, 774, 790, 802). Therefore, the undersigned **FINDS** that the ALJ properly considered the opinions that Claimant was partially or totally disabled and the ALJ's assessment of the opinions is supported by substantial evidence.

### C. RFC

Claimant argues that a more reasonable assessment of the evidence demonstrates that she is disabled, or certainly that she could not perform work at the light exertional level. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed;

33

(2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, Claimant cited records relating to her neck and back issues, COPD, carpal tunnel syndrome, myofascial pain syndrome, panic disorder, and depression, and her physicians' statements that she was disabled. (ECF No. 9 at 5-6). She argues that the ALJ did not properly analyze such evidence and incorporate corresponding limitations in her RFC assessment. (*Id.* at 7). However, the ALJ expressly considered the evidence cited by Claimant and all other evidence in the record in assessing Claimant's RFC. (Tr. at 18-

20). Specifically, the ALJ noted Claimant's mild objective findings and conservative treatment for her neck and back issues, negative chest x-ray, no more than mild respiratory distress on examination, mild right carpal tunnel syndrome, her largely benign IME results, stable mental status examinations, and other findings. (*Id.*). The ALJ also gave great weight to the state agency opinions that Claimant could perform a limited range of light work, except the ALJ added limitations related to Claimant's carpal tunnel syndrome whereas the agency physicians did not assess any manipulative limitations. (Tr. at 20).

Claimant does not identify any relevant functions or evidence that the ALJ overlooked in assessing her RFC, nor does she identify inadequacies in the RFC discussion that frustrate meaningful review. Rather, Claimant proposes that the Court independently review the record and reach a "more reasonable" conclusion that Claimant cannot work or that she is limited to working at a lower level of exertion. As stated by the Commissioner, Claimant's proposed reasonability standard is not the standard that the Court employs in evaluating the ALJ's decision. (ECF No. 10 at 13). The role of the Court is not to second-guess the ALJ's RFC assessment, but to review it, along with the record, to determine if the ALJ correctly applied the law and the decision is supported by substantial evidence. "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. It consists of more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Colvin*, 639 F. App'x 921, 922 (4th Cir. 2016) (quoting *Pearson v. Colvin,* 810 F.3d 204 (4th Cir.2015)). Importantly, the Court does "not reweigh conflicting evidence or make credibility determinations in evaluating whether a decision is supported by substantial evidence; rather, where conflicting evidence allows reasonable minds to differ, we defer to the Commissioner's decision." *Id.*

35

(quoting *Hancock v. Astrue,* 667 F.3d 470, 472 (4th Cir. 2012) (internal markings omitted).

Claimant's carefully chosen list of the medical evidence fails to represent the full record. For instance, Claimant cites that her December 2013 MRI reports documented disc bulges at C5-C6 and L4-5. (ECF No. 9 at 5). However, Claimant omits that the MRI report listed that the L4-5 annular disc bulge was mild without herniation and all foramina were widely patent without nerve root exit compromise. (Tr. at 418). There was no evidence of subcortical stress, osteoedema, or spinal masses. (*Id.*). Similarly, Claimant's central annular disc bulge at C5-6 was without herniation, no extruded disc, and no evidence of nerve root compromise. (Tr. at 420). Her foramina were likewise widely patent and her nerve root exits were without any entrapment. (*Id.*).

Similarly, other evidence disputes Claimant's selective citation to certain physical examinations that demonstrated decreased breath sounds with rhonchi. (ECF No. 9 at 6). As already discussed, Claimant's later records repeatedly documented her unlabored breathing and normal respirations. (Tr. at 605-06, 774, 790, 802, 808). In fact, Claimant did not suffer respiratory distress even though she continued to smoke against medical advice. (*Id.*).

Next, regarding Claimant's citation to the June 2014 x-ray of her right wrist showing congenital shortening of the fourth metacarpal bone, Claimant again leaves out that the report stated that the condition was mild and that her right hand was otherwise unremarkable. (ECF No. 9 at 6); (Tr. at 459-62). In addition, her August 2016 EMG and nerve conduction study results were consistent with only mild carpal tunnel syndrome on the right and negative for carpal tunnel syndrome on the left. (Tr. at 812). Claimant had slight weakness in pinch and grip bilaterally and decreased sensation to pinprick along

the median nerve distribution during her June 2015 IME, but there was no evidence of thenar or hypothenar atrophy in her hands, she had full range of motion in her hand and finger joints, and she could make complete fists. (Tr. at 808). Notably, the ALJ added to Claimant's RFC a restriction that she could only frequently handle, finger, and feel with her right upper extremity to account for her carpal tunnel syndrome even though the state agency physicians did not assess any manipulative limitations. (Tr. at 20, 20 n.2).

Claimant's references to her June 2015 independent medicine examination and January 2017 CT study are similarly unavailing. As discussed at length, despite Claimant's antalgic gait and lower extremity muscle strength of 4/5 in her lower extremities during her June 2015 examination, her records subsequently documented her full muscle strength, normal gait, and other functional abilities. (Tr. at 606-07, 733, 774, 790). Claimant stated that she had no restriction in activities of daily living. (Tr. at 771, 802). Moreover, her CT study showed no fracture of subluxation and only mild degenerative disc space narrowing at L5-S1. (Tr. at 773).

As to Claimant's citation to mental status examinations that she contends demonstrate panic and depressive disorders, Claimant fails to account for the overwhelming normal mental status examinations and notations of minimal issues. (Tr. at 426, 473, 485, 496, 500-01, 515, 518, 521, 524, 530, 606-07, 611, 774). Importantly, the ALJ performed the special technique to evaluate Claimant's mental impairments and Claimant does not challenge his analysis of the paragraph B criteria. (Tr. at 15-16). The ALJ considered Claimant's statements, as well as the objective and opinion evidence, to translate Claimant's mental functional limitations into RFC restrictions. Claimant fails to show how the mental status examinations cast doubt on the ALJ's logical analysis of her mental conditions.

As summarized above, the ALJ considered the relevant evidence concerning Claimant's functional abilities and articulated a cogent, well-supported RFC assessment with specific citations to the record. Claimant's piecemeal list of evidence does not undermine the ALJ's findings, as the ALJ considered the evidence cited by Claimant, and all other evidence, in determining Claimant's RFC. For the reasons stated above, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

### D. VE Testimony

Lastly, Claimant contends that the ALJ should have accepted the VE's opinion that she could not work if she was absent from work three-to-four days per week. (ECF No. 9 at 6). In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that

jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this matter, the ALJ questioned the VE whether someone with Claimant's characteristics and RFC could work if the person missed three-to-four days of work each week due to physical and mental impairments. (Tr. at 84). The VE responded that it would preclude all unskilled work if the person was absent that often. (*Id.*). Claimant indicates that the ALJ should have accepted this testimony and concluded that she was disabled. However, Claimant does not offer evidence demonstrating that she would miss work three-to-four days per week. Claimant's MRIs, x-rays, CT scan, and physical and mental status examinations did not document any extreme limitations, symptoms, or impairments to the severity that she would miss work at that frequency. Moreover, Claimant attended church several times per week, maintained other activities, and reported no limitation in activities of daily living. (Tr. at 80, 771, 802). Therefore, there was no justification for the ALJ to rely on the VE's response to the hypothetical question concerning an individual who missed work three or four times per week. As the ALJ very clearly explained in the decision, such limitation was not supported by the evidence of record. (Tr. at 1003). Accordingly, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony at steps four and five of the sequential evaluation.

## VIII.   Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9); **GRANT** the Commissioner's request for

judgment on the pleadings, (ECF No. 10); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: February 21, 2020

Cheryl A. Eifert
United States Magistrate Judge